Calling Case No. 25-1159 et al., People of the State of Michigan, Petitioner v. United States Department of Energy and Christopher M. Wright, Secretary, United States Department of Energy. Mr. Wilkinson for the Petitioner, State of Michigan. Mr. Shiley for the Public Interest Organization, Petitioner. Mr. Stander for the Respondent. Mr. Schultz for the Intervenor, Pennsylvania Energy Commission. Can I just get the court sheet? Good morning, counsel. Good morning, Your Honors. Mr. Walden, please proceed when you're ready. Thank you, Your Honors, and may it please the court. Lucas Walden is appearing here today on behalf of Michigan Attorney General Dana Nessel, as well as the other state petitioners in this case, Illinois and Minnesota. The Department's claim of authority here is unprecedented, and a fund check would transform the structure of power for regulating resource planning as it has been commonly understood for decades. The Emergency Clause of Section 202C presents a limited exception to a general reservation of state authority. The section's plain language, past interpretation, and context make clear that its exercise is constrained fundamentally by the existence of an emergency, that is to say, conditions necessitating immediate action by the Secretary. The Department instead asserts that it is unbounded in its application of 202C, that it can use the emergency exception to undermine years-long resource planning frameworks without consideration for whether the Secretary's immediate action is needed. That reading would allow the exception to swallow the rule, leaving all resource planning decisions subject to unilateral override by the Secretary with no limiting principle. In turn, it would allow the Department, as it has here, to interrupt and frustrate a finely calibrated system of overlapping regulatory processes, including the application of state statutes, the planning and cost recovery practices of utilities, and the entrenched rules of system operators, along with FERC's regulation of those rules. The Court should thus hold that the Department cannot use its 202C authority here and set aside the order on that basis. The Department is further erred by failing to present substantial evidence to support its emergency determination and by failing to appropriately tailor its order to address any emergency which presents an independent basis for holding a lawful and setting aside the order. Can I just ask a question so I can appreciate where the parties are on what constitutes an emergency? Sure. If there's a danger, a risk of harm that's off in the future, but the actions needed to address that risk are ones that need to be taken now. So, there's immediate action that's necessary to avert a risk that's going to germinate in the future. Does that constitute an emergency from your perspective? So, no. I mean, in terms of a long period of planning where there is a potential for an emergency years in the future, that is within the realm and ambit of existing regulatory processes. If you say it's a potential for an emergency, then you don't have an emergency now. I mean, I totally get that point. I mean, if it's a risk of a significant shortage, but the shortage isn't going to happen for a little while, but in order to avert that shortage from happening in a little while, there needs to be immediate action right now. Would that constitute an emergency? So, no. And that's because we have so many regulatory processes already in place to address that. And I'm going to talk about that for just a little bit. You have to keep in mind, we spent time in briefing talking about the role that the Public Service Commission and utilities play from integrated resource planning, as well as the system operator performing studies to make sure that retirements are okay. You also have to keep in mind that MISO's tariff is regulated by FERC. And FERC has the ability to undertake efforts to attempt to steer resource planning if it so chooses. And furthermore, the Secretary himself has the ability to influence that process through Section 403 authority. He can ask that FERC undertake those methods as well. So, you have to understand that there's a breadth of mechanisms, starting at the state level, but including federal regulation, that act before the Secretary's specific emergency authority kicks in. And that makes sense because his Power Runner 22C is extraordinary in that it provides no procedural safeguards of notice and hearing. And I'll say as well, the Otter Tail case that we looked to, Otter Tail Power, we looked to in briefing, explicates this scenario a little bit better. So, in that case, it was expected that a small utility's load would increase in just over a year or so, such that it would start to run an acute risk of load loss. The Eighth Circuit, in that opinion, described that the load loss event as it would occur in a year or so would be an emergency condition. It described it as such. But at the time at issue, that is to say a year or so before any such potential load loss event would occur, the court identified that a resolution did not necessitate immediate action by the Secretary, and therefore that 22C did not apply. So, the point being there that even in a context where, in that case, not this case, in that case, where one could certainly say that poor planning by utility would be an underlying cause of a potential future emergency, the court did not assess the planning itself to be an emergency necessitating immediate action. And instead, it looked to 202B, which does provide procedural safeguards. That's a situation in which there wasn't any immediate action necessary, just even by the way you've described it. And I think, I'm not sure there's any disagreement that if there's no immediate action necessary, then the circumstances don't present an emergency. I guess the question that I'm asking conceptually is the risk may be, the risk and the harm that's about, that's going to be visited may be off in the future. But it may be a situation in which immediate action is necessary to force all that risk. And what I'm wondering is, if you don't think that that qualifies as an emergency, and that sounds from your answers that you don't, suppose one were to think that that is an emergency. That if you have a circumstance in which immediate action is necessary to force all the risk that's going to germinate down the line, if that would qualify as an emergency, does that mean that you can't prevail in this case? Or do you still have an argument that you can prevail even if it's a circumstance in which immediate action is necessary? And you may well have an argument that actually this is not a situation in which immediate action is necessary. I totally understand that. But I'm just wondering if one thought that this could be described as a situation in which immediate action is necessary to avert a harm from coming to fruition down the line, then where are you in the case? I'm not sure the theories around such a circumstance where there would be an immediate. And to be clear, that is not this case.  And I want to talk about that more in a minute because it has to do with the confines of how the department has described that the emergency is starting here. But theoretically, if there were a case where there was literally nothing else that could be done, other than to undertake action in the present to avoid a future point. And I will say, too, we're speaking in relative terms, right? Like, I'm not sure what you're describing, but theoretically, maybe that could be a case, not this case, but a separate case where you could describe an emergency authority. But I want to be very clear that the court doesn't have to go drawing lines in this case around where imminency stops and starts. Because as I kind of previewed there a second ago, the government is saying, sorry, the respondents are saying that they're not confined whatsoever to an imminency component when they need to act. They're saying they can identify generalized conditions spanning years into the future across huge swaths of the country. And furthermore, asserting plenary authority to determine when those conditions exist. So the court here doesn't need to draw lines around when imminency stops and starts. All it needs to do on the statutory interpretation question is say that the respondent's position on that point is wrong. And it does not justify using the two that you see here. I think perhaps to follow up on the Chief Judge's question, it seems that there's a lot of ink spilled in the brief about, you know, definitions of emergency in various dictionaries and statutory contexts. And one of the arguments or points of disputes seems to be on whether to be an emergency, something has to be kind of unforeseen or unforeseeable. And I think at least what the Chief Judge may be getting at is something that I've thought about as well, which is something like climate change. Is climate change an emergency? A lot of people would say that it is. It's not something that is going to result in devastation, according to scientists, tomorrow. But in the future, and therefore, you need to take action now to avert that risk or anything else that you can see coming down the road, but you conclude you have to take action now to avert the risk. It's not unforeseen because we know what the risk is. So something that's foreseeable, that you have to take action now to avert, is that an emergency? The emergency, the application of 202C steps in when it is needed for the Secretary to act under that specific section. And that's because it exists within the context of the statutory scheme, where we have all these other processes from a state level and also integrated with federal oversight that serve as a planning mechanism. So in the climate change context, for example, in the context of 202C, where we talk about where the Secretary needs to act under that, may be required to act immediately under that section, it would not be an emergency in that context. Now, I would hope that the other regulators that have these long-term planning responsibilities under the statutory scheme would take it seriously and proceed with a sense of urgency to correct that. But in the confines of Section 202C, that is simply not the case. So I guess in writing an opinion, should we say that the meaning of emergency is an unforeseen circumstance? Or can an emergency be a foreseeable circumstance, but it's an emergency because you have to take action on an exigent basis? There could be emergency occurrences that could be somewhat foreseeable. And that is, for example, in the context of the Otter Tail case that I described, where they could tell in a year or so they were going to run a risk of emergency. But the underlying principle that's at the core of all the adjectives we glean from dictionary definitions, past interpretations of the statute, and otherwise, is an immediate need for the Secretary to act under that section. So you believe that exigency is really more relevant or important to defining emergency than foreseeability? Yes. And we stress imminency in briefing, but I think we're saying the same thing as far as you're using the word exigency. But it seems like you're adding one gloss to it, which is that you think that an emergency is when there is an exigency, as was described. But even the existence of an exigency wouldn't be enough to constitute an emergency for two FCC purposes. Because you think it has to be – and this may – I'm not saying – I'm not meaning to express skepticism. I'm just wanting to make sure I understand your position. It has to be an exigency as to which DOE has to act, meaning that there can be an exigency as to which someone else could act and avert the harm that could occur down the line. But you think under 202C, it requires more than an exigency. It requires an exigency as to which DOD is the only – I mean, DOE is the only entity that can take action to avert it. Is that the way you think? That is correct. Sorry. Yes, that is correct, in part because I described it, because there are already so many tools at play, including at the Department's own disposal, to influence planning and averting emergencies well before that extraordinary remedy without procedural safeguards is necessary to step in and play a role. So I guess my question – sorry, just one quick follow-up. My question about that is why would we think that Congress would have thought, if there's a circumstance that constitutes an emergency, at least in the sense that it requires immediate action, so it's an exigency, requires immediate or imminent action, even for a risk that's going to come to fruition down the line a little bit. And if there's other players who could also take immediate action, someone's got to take immediate action. There's various immediate actions that could be undertaken, but someone's got to do something right quick, because otherwise we're going to have this serious risk down the line. Why do we think Congress would have thought that DOE should be disabled as long as it's possible that someone else can handle it, as opposed to a Congress saying, if it's that kind of circumstance, I just want to make sure that somebody acts, so I'm going to go ahead and let DOE do it. And then if there's duplicative efforts and we're just having a lot of folks react immediately to an emergency, I get that. That comes at a cost, but I just want to make sure that the emergency isn't there. Well, we can understand that from the structure of the statute. And that is to say, we start with the applicability section of 201, which reserves the general authority over generation planning to the states and provides for only specific exceptions to that general reservation authority. And we talked in briefing, I think you mentioned in opening here, sort of conceptually how a unilateral override would allow the exception to swallow the rule. But there are practical consequences to that as well, which potentially Congress didn't envision when they were setting up the statutory framework. I mean, for one, a unilateral override would interfere with the ability for regulators and the systems that have been developed over decades to understand how much capacity will be on the grid or will be needed on the grid at any point in time. And the consequences of making mistakes in that context entail incredible costs. We're seeing that with consumers energy here. You know, they're reporting well over $100 million in net financial impact for continuing to run the Campbell plan pursuant to a 202C order. And that's not surprising because their own expert forecasted that they would save rate payers well over $300 million from foregone capital expenditures, major maintenance costs. So, Mr. Walden, just the same issue, I just wanted to probe a little bit more. I take your position to be in response to the questions that have been posed about if it's something that may not come to fruition for a while, but if it does, if there's not action now, it will be an emergency. I take your response to be that 202C is only available if that is sort of a last resort and it's structured into the statute as a last resort and that eminence is, in fact, the scene of one on because there are all these layers of longer-term planning. And DOE has a role also in triggering that. So, if you have a region that is failing to do planning and you say, whoa, if they're continuing on this path and not seeing the percentage risk of huge megastorms because of climate change or something, that's not an occasion to use 202C. It's an occasion for the Department of Energy and FERC and the regional planning apparatus to be prompted to act more constructively with respect to that. So, it is my understanding that you're basically saying this is a last resort for good reasons. And I actually thought that the energy law professors, energy law scholars were laying out the point that I think you just alluded to, which is if you get this sort of diving in to the middle of a long-term planning process, then all the variables shift. And you end up with sort of environmental and price bumps that are just, it ends up just sort of being a free-for-all. And so, there's the reason why this is a last resort tool, because you don't need it if you have all this long-term planning. You know, you have a market. You have a market that you can use at the last minute. You have capacity. You have excess capacity. You know, the whole planning process is a lot of anticipating of unanticipated factors. And so, if you're thinking that there's going to be a problem down the road, you route that into the ordinary planning process. Is that right? Yes, Your Honor. And I want to emphasize one more point I don't think you touched on there, which is that the existing processes are also just simply better positioned to address these resource planning questions. And the Department acknowledges as much in the Resource Adequacy Planning Report where they state that DOE acknowledges that the resource adequacy analysis that performed in support of the study could benefit greatly from the in-depth engineering assessments which occur at the regional and utility level. And they go on to say, well, however, entities responsible for the maintenance and operation of the grid have access to a range of data and insights that could further enhance the robustness and reliability decisions, including resource adequacy, operational reliability, and resilience. So, there are a variety of factors here for interference process reasons, for the incredible costs that are entailed with making mistakes in that process. And for just a straightforward capability reason, it would not make common sense to give the Secretary a unilateral override as to the robust and intricate processes that currently exist for resource planning. I took you to be having some hesitation in answering the prior questions. And is there anything behind that? Or, I mean, it just seems like if it's a last resort that that's just, you know, that's just the case. But is there a pushback there or precedent that that doesn't line up with? My hesitation was really about line drawing. And I think it's easy to get into a line drawing question here. But as I said, you know, earlier to Judge Trubausen, this case really is not about that. Because the Department's position is fundamentally opposed explicitly to any concept of imminency being a requirement whatsoever for the exercise of 202C authority. Make sure my colleagues don't have additional questions at this point. Okay. Thank you, Your Honors. I'll pass off argument to my colleague from the public interest organizations. Thank you. You're welcome. Mr. Shagnon. Good morning, Your Honors, and may it please the Court. Ben Shagnon for the Public Interest Organization Petitioners. I'd like to try to reserve three minutes for rebuttal. So, I want to pick up right where the questioning left off just to make clear that this case isn't about whether the grid faces challenges or whether they should be addressed. The real question is who has the authority to address those challenges and how. And getting to this exigency point and last resort point we've been talking about, in most usual cases, other actors have the authority to address these problems, not the Department of Energy. They really should serve to exist only as a last resort. And so, to take on— And does that mean, just to get the lexicon right, does that mean a last resort in the case of an emergency? So, the first layer is, is there an emergency? Yes. And then the second layer is, even if there's an emergency, DOE can only come in as a last resort. Is that how you understand the statute? Or are you saying— Yes, that's right. So, I think everyone could agree that there's a problem that needs to be solved, and everyone could agree that it would be most prudent to start solving that problem right now. And then there's this further question of which tool in the toolbox should be used. And very rarely should the answer be the Department of Energy's tool. But I think that's a different answer from what the Chief Judge was proposing. I mean, you can speak for yourself. But if I were asked, does last resort mean, assuming there is an energy, an emergency, DOE can only come in as a last resort? I would think it's not an emergency, unless it's a situation in which DOE's last-minute intervention is needed. Because an emergency is the thing that triggers 202C. And what I understood your colleague from Michigan to be saying is there are important problems that could cause a lot of difficulty down the road that we take very seriously. You know, new demands for energy, storms, high heat situations. Those are not emergencies because there are layers and layers of long-term planning and lots of expert actors that are actually thinking about those today. If they're not, then you don't use emergency power. But the Department of Energy can come in and say, you're not looking at something important. That's right, Judge Pillard. So, you might think that it's a pressing problem, but we wouldn't call it an emergency in the Section 202C sense. Because what Section 202C's emergency is talking about is those circumstances where there's a pressing necessity for the department to act, not just anyone to act. And so, we're thinking about this climate change hypothetical that Judge Wilkins raised. There might be a need to act in the present, but there wouldn't be a need for everyone to act in all ways right now. We would want to use the normal processes that are set up to address that kind of challenge. And to think of just an ordinary, everyday kind of analogy, if we're driving along in a car and we decide, oh, we need to stop at this red light up ahead. I think we would look first to the regular brake, not the emergency brake. Because we tend to use normal mechanisms to solve problems before we go to extreme ones. And as my colleague from Michigan made clear, there are features of this system that do make it the extreme option. We can look to the facts of this case, where Consumers Energy was set to retire this plant. And they took a lot of steps to make sure that it would work. They went and bought and acquired an entirely new gas plant with 1,200 megawatts of capacity. And all that is for naught if that planning exercise, that extreme planning exercise, makes little sense if Campbell was going to stick around anyway. So, it's corrosive in that sense. And it's also corrosive in the sense that the department recognized in its original 1981 regulatory preamble, where it said, we're wary of jumping in to do long-term planning ourselves. Because we don't want people to think, we don't want utilities to think that we're always going to step in and solve their problems. Long-term planning is their job. We think they're best physicians. Congress required them to take on the mantle of solving these long-term issues in the first instance. And that makes sense for all the reasons my colleague from Michigan made clear, which is the state planning process, for instance, in Michigan, has a 5, 10, 15-year forward-looking procedure where they figure out what's load going to be, how can we best address it, what policy decisions we want to make around that. That isn't present when you use 202C. Likewise. So, can I ask this question? So, suppose you have a situation in which, yes, in theory it's possible that other kinds of interventions and planning by other entities and institutions can address the looming harm. But DOE looks at it. And I'm not saying this is the case. I'm just trying to understand how the statutory scheme works in the abstract. And the DOE looks at it and says, yeah, that actually, in theory, could work. I'm just investigating this. And I don't think they're doing it in the right way, or I don't think it's happening with sufficient exigency. At that point, is DOE free to use 202C to step in? Or is DOE supposed to use some longer-range tool that it can have, maybe under one of the preceding provisions, to spur the other processes to act in the way that DOE thinks would be necessary? So, no, they shouldn't be doing that, as Judge Pillard's earlier question. Does that mean 202C? They shouldn't be using 202C. So, one example of what they can do, and we haven't focused on this on the briefing, but there's 42 U.S.C. 7173, which is part of the Reorganization Act. And it empowers DOE to tell the actors, the FERC, that it should engage in rulemaking, for example. So, if it doesn't think that MISO's tariff is getting the reliability or resource advocacy job done, or if it doesn't think NERC is getting the reliability job done, it should tell them that and say, your analyses are no good. Please revisit these questions. You cited a rule of statutory provision, which was? 42 U.S.C. 7173A. How about anything less cumbersome than rulemaking? So, they can also issue the kind of report that they issued shortly after the initial order came down, where they can analyze the problem and inform folks. And separate from DOE, it's not that the federal government is without tools to solve these problems. There's NERC, which is an independent entity, but it is organized and supervised by FERC. As part of that process, they've set over 80 mandatory reliability standards, including establishing the one-day-in-10-years risk standard that animates the entire industry. You also have FERC supervising MISO, who's the planning coordinator at issue here, who's doing all of these analyses that DOE is looking at in its order and finding no real reason that they're insufficient. Tell me a little bit about if the Department of Energy comes in under 202C, is part of what happens is that the pricing and demand analyses that are in the long-term planning, like other generation sources, you're going to be relied on this amount, this amount, this amount, that that just gets upended. So you might end up making a different source of energy, the new natural gas plant that they brought on, to make that actually no longer financially viable because they're prioritizing the output from the legacy coal plant. Tell me a little bit more concretely about the destabilizing impact of the kind of parachuting in on long-term planning by the Department of Energy post-HOC. So there's the set of problems you described. If we also look at the kind of planning option we have that MISO did here and that the department looks at, all of that is trying to figure out exactly how much capacity we need on the grid, in part to determine what prices might be and what signals that should send about future investment. It's hard for first-line investors who are trying to build this capacity utilities. It's hard for state regulators. It's hard for MISO to know exactly what role Campbell's going to play. One feature of the department's order here is it identifies this open-ended emergency. We don't think there's any pressing need based on what the record says, but they also identify no criteria under which it might end. So it's very difficult for anyone to plan because right now there's potentially up to 1,560 megawatts going to be on the grid. That crowds out other investment or other opportunities to add other stuff to the grid. And one of the core problems that the department cites in its brief is there's this ongoing effort to interconnect more generation to the grid, and that becomes more challenging unless you have a complete picture of what's already there. So I'd just like to offer a few more words of comfort about why adopting the rule we're talking about won't upend society. So the first is if you look at all of the historical examples that are cited in our brief and the state's brief and even the government brief, adopting the line we've described here and worked through with your honors would not require any of those orders to be undone. So it's really just starting with this order and the subsequent orders in other areas of the country that are doing this long-term planning. But even the Morant case, which is this 2005 case about this area of the country, that we think would be perfectly acceptable because there was an imminent need for the department to act because there was going to be a shortage or a real risk of a shortage of losing electricity in downtown D.C. This Yorktown order from 2017, similarly, there was an imminent risk, as the department clarified in its rehearing order, that over 150,000 people might be without electricity unless the department acted. So even in those cases, which were thought to be on the outer edges of Section 202C, we think those would fit comfortably within our rule. The second thing is just to make a little bit clearer that even if some of these long-term challenges aren't addressed, I do think it's important to note, and this is reflected in our briefing but also in all of the work MISO does, that there are very compelling ways for MISO to react to short-term problems, and they do this all of the time without going to DOE for help. They can do very common-sense things, like if there are plants being maintained optionally, we suspend optional maintenance. We can get imports from neighbors, and we can do a bunch of other things like that before we ever activate the extreme remedies that the Department of Energy can provide. If you have one more point, you can make that quickly, and then we'll give you some rebuttal time, too. Absolutely, and so I think what that all shows is just that it's very unlikely, and this sort of imminence concept that's very common in the law, that all the department has is speculation that these things happen, but they haven't worked through, they haven't done the work to figure out that the harms they fear are going to happen with a certainty, because all these other actors are doing their best to solve these issues. I'll make sure my colleagues don't have additional questions. I just have one, and I know the language in this area is specialized, and we'll hear from the department on this, too. But, you know, the department, in its order, identifies potential tight reserve margins during summer 2025, elevated risk of operational reserve shortfalls during periods of high demand or low resource output, and the MISO planning resource auction results say new capacity additions were insufficient to offset negative impacts. They say just, like, it's all there, admitted that there are shortfalls, gaps, potentially tight reserve margins. Is there anything about the, like, terminology that it sounds bad but isn't, and that you can tell us why that squares with your position? So, agreed that it all can sound bad, potentially, but none of it is bad. So, starting with the tighter reserve margin, a reserve margin is set in the first instance by MISO to achieve the standard of risk tolerance that the overall system uses. And then they achieve a margin on top of that, a buffer on top of that to make sure that things are extra reliable. And even still, there was a surplus of generation beyond that. The government makes a big deal about how the surplus has reduced, but there's nothing magical about how much surplus one has. In fact, having too much surplus can be a bad thing, because that can mean that you're paying more for electricity than you might, or generating more electricity than you might otherwise need. In terms of all these statements saying new capacity hasn't made up for some of these losses they're describing, in some ways, that's the function of the auction. It's, in part, a planning tool, what capacity we have, and this is present in the auction results itself. It's also a tool to tell investors, hey, it's worth investing here. More capacity will be needed going forward. We think there's real room for you to take advantages of these higher prices and come on in. So it's a planning tool in both of those senses, and MISO had specifically tailored its auction results to achieve that kind of end to more accurately reflect these dynamics. And as for the NERC assessment, it often says things like you might need. There's elevated risk, and so there's a possibility of shortages in some sense. But what the NERC assessment says, and this is at page JA-118, when talking about the MISO region in particular, it says things like that is mostly a risk that you will have to go into all of these mitigation measures I talked about, using things like importing from neighbors, curtailing your own exports, and engaging in things like demand response. And there's no reason to think that the importing from neighbors is going to be unavailable. That's right, and the government might suggest that that is during things like winter storms. But one thing that's true even in that context, and this is in JA-414, is that we don't all experience peak demand across the country at the same time. We don't all have outages at the same time, so it's perfectly common, even during the hardest winter storms or things like that, for importing to continue. One very pointed question. The first issue was a surplus one, and that drew a fair amount of attention, particularly in the opening order. Is it your view that a surplus is kind of like a prophylaxis on top of a prophylaxis, such that no matter how much the surplus might dwindle, that can't be an emergency? That may well be right, but I'm just wondering if that's your perspective. So that is a layer of prophylaxis, such that no matter what happens to that, we're not in an emergency. That's right.  And maybe as the surplus is lower, the increased risk would be one of needing to use these mitigation measures. It wouldn't be a huge risk that there will be actually blackouts on the ground. There wouldn't be too much ECE territory. Exactly. Okay, thank you. I'm sure my colleagues don't have any questions at this point. We'll give you a little time for rebuttal. Thank you. Mr. Stander? Good morning, Your Honors, and may it please the Court. Robert Stander here on behalf of the Department of Energy. The Secretary of Energy is not required to wait for a blackout to happen before invoking Section 202C of the Federal Power Act. In the Campbell order, the Secretary identified a shortage of electricity that called for immediate action. The circumstances he identified fit within the ordinary meaning of emergency, as used in the statute. Within that boundary, Congress delegated to the Secretary sole discretion to determine how much risk is too much risk, how much of a shortage is too short. And the order must be affirmed so long as it's supported by substantial evidence, as it is here. If I may, I'll start by addressing the meaning of emergency, apply it to the circumstances here, and then turn to a key precedent of the Morant order, which directly refutes some of the petitioner's arguments here today, and that was ratified by Congress when it amended the statute in 2015. And I'll then turn to the petitioner's other main argument about usurping the role of long-term planners, and show why that's wrong and should be rejected. To begin, there's a lot of back and forth in the briefs about the definition of emergency, and we can just dispense with that here today and start with the definition the petitioners cite from Webster's first. And Webster's second has the same definition, but it's more timely. And they define emergency as an unforeseen combination of circumstances that calls for immediate action. And then the statute adds specific circumstances that may call for immediate action, including a shortage of electricity. Now, that definition is fine as far as it goes, but it doesn't at all answer the question here, which is when the circumstances call for immediate action. How much risk of a blackout is too much risk? And Congress delegated that solely to the discretion of the Secretary. We apply that to the circumstances here. The Secretary identified a combination of four circumstances that call for immediate action. First is the imminent shutdown of the power plant. So on the preparatory question, so this is all, I think, going to bolster the notion that there's a need for immediate action. Correct. So there's at least one statutory provision, and there's so many floating around, I can't remember the name, the section number offhand. But it's adjacent to this one that uses the term immediate action in connection with emergency. And that's a succeeding provision. And just remind me what the words of that are, because it says it pairs emergency with immediate action.  And then you have an argument in your brief, I think, that the negative pregnant of that is that because this provision, 202C, doesn't pair emergency with immediate action, then an emergency for 202C purposes doesn't actually require immediate action. So we make that argument in our brief, Your Honor. We have the need for immediate action here, so I think that's sort of beside the point. You're not relying on that, then. You're willing to accept that an emergency, in fact, requires, is something that, in fact, requires immediate action. The emergency here required immediate action. So within the scope of this case, we're fine with that definition. But your assertion of authority, actually, is that something can constitute an emergency for 202C purposes, even if it doesn't require immediate action. I'm not making that argument here today. What I am arguing is that this provision… I just want to understand. I'm not trying to be difficult, but I thought that was the takeaway from the brief, is that… The takeaway that I'd like to leave you with is 202C does not require intensifiers. It doesn't say last resort. It doesn't say, absolutely, we need it, only if absolutely necessary right now. It doesn't have all these added intensifiers. All these things that are in there, that's our argument today, is it's just emergency. And here's what an emergency is, an unforeseen combination of circumstances that calls for immediate action. That's our point. That's your understanding. Correct. It does call for immediate action, actually. So with this explanation, if I can explain the immediate action that was required here and that was required in the Morant Order, I think it will help clarify. So the circumstances here, the imminent shutdown of the power plant, an elevated risk of a blackout, according to NERC, the standard-setting entity for North American Green Reliability. And third, an unexpected surge in demand from energy-hungry data centers. And then fourth, the shutdown of the plant required imminent action, immediate action, because the shutdown was to be permanent. And so once it's shut down, it's not available in times of peak demand, like during a heat wave or a wind drought or a severe storm. I'm sorry, I was looking for the statutory language. Imminent shutdown of Campbell, the data centers increased demand, and your two others were? An elevated risk of a blackout. According to NERC, the standard-setting entity says there's an elevated risk of a blackout. And then fourth, the need for immediate action is because once the plant shuts down, it was to be permanent, and you can't bring it back to serve in times of peak demand. That's separate from imminent shutdown of Campbell. It's the difficulty of reversing that. You can't reverse it. Correct. Right now, it was shut down May 31st. It was scheduled to shut down. If we don't act now, this is permanent, it's done, and it's not going to be there. So this is a more record and evidentiary question, or also definitional, but the order defines the emergency here as an anticipated shortfall in August of 2025. What is the department's view of what, in a factual sense on the ground, the current emergency is? Well, the emergency identified in this order, I just want to be clear, the only thing before the court today is this order. And so, in fact, we asked to have this order and a second order consolidated so that the entire record would be before the court. The petitioners objected to that, and the court denied that. So I think what we're talking about here today is just one order, and the combination of circumstances was identified was a shortage of electricity. And the shortage of electricity required immediate action for the four combination of circumstances I just identified. So that's what this order is about. I don't understand that response, because if the order is, if all we're reviewing is the initial order, which identified an emergency based on the events that were projected to happen in August 2025, why are we here? Because that's come and gone. The reason that we're still here, and I guess that this isn't moot, is because it's capable of repetition and could evade review. Therefore, why don't we look at what the purported emergency is now, because it appears to be repeating? I mean, I don't understand what basis you think there is for us to ignore the facts as they exist right now, or the justifications that have been given to continue the emergency. So I'm happy to discuss that series of issues, as long as we're clear that the order under review here is the Campbell 1 order. However, to answer the question, the current, just to talk about the current order, is a continuing shortage of electricity. A continuing shortage of electricity. And to look at sort of some of the record support for that, you know, it's hard to even talk about record support, because we're talking about a record that's tied to Order 1, not a record that's tied to anything else. But the statements that are in the record from MISO, for example, two vice presidents of MISO, we have testimony in the record walking through the shortage, the issues with the grid. They say things like, so this is Todd Ramey, vice president of MISO, says, Changes in the grid, shifting generation from reliable thermal energy to unreliable wind and solar, and quote, unexpected demand for energy hungry data centers. He says these changes pose a host of complex and urgent challenges to electric system reliability. That's testimony from May 2025. He says to maintain system reliability, we must respond to the unprecedented change. That's a JA721. There's also testimony from Jennifer Curran, another vice president of MISO. So it's these sorts of statements that talk about ongoing grid reliability problems, and the response to that is to keep power plants, major power source, online. And that's a discretionary judgment call for the secretary that Congress delegated to the secretary in U-202C. So that's, to answer the question about what's going on now, that's the answer to that. But just to take us back to the KM-1 order. So aren't we supposed to, in construing 202C, to look at what I guess is considered 202A? And I hate referring to things by these shorthands when that's not what's in the U.S. code. But I think the U.S. code provision talking about the 16 U.S.C. 824A, subparagraph C. But if we jump up to subparagraph A, there Congress says for the purpose of assuring an abundant supply of electric energy throughout the U.S., et cetera, et cetera, the commission is empowered to divide the country into these regional districts, and then that's how you get MISO, and that's how this planning is all supposed to happen. So what are we supposed to do with that? Well, Your Honor, this 202C order is clearly not doing the type of long-term planning the petitioner suggests when they point to this provision. This provision authorizes FERC to divide the country into regional districts. The Secretary is not using 202C to divide the country into regional districts here. He's not using 202C to create nationwide reliability. I'm not saying that the Secretary is doing what's in 824AA or 202A. What I'm saying is that 202A is how Congress said long-term planning is supposed to be done, and the petitioners are saying that that's why you don't use 202C to do long-term planning, and that's what's happening here. Well, Your Honor, two responses to the long-term planning argument. The first is that long-term planning and 202C orders are not the hermetically sealed categories that petitioners would have you believe. Every time there's a 202C order, at least often when there's 202C orders, it will in some way interfere with or override the prior decisions of long-term planners. That's a different point from saying that 202C order can be used to respond to, I think as your brief argued, to alleviate longer-term shortages of electric energy, even if an acute shortfall or blackout might not materialize until much later. So that goes back to the series of questions at the beginning of Michigan's counsel's argument, which is if it's the kind of anticipated shortfall, even assuming there is an anticipated, that long-term planning has not yet woken up to a long-term risk, what's your response to the notion that, well, but it could, and the Department of Energy, including through FERC, has tools consistent with the state's primacy and the regional organization's primacy in long-term planning to go there to affect it, rather than kind of diving in in a unilateral way that doesn't take the systemic interest into account? Well, Your Honor, if I could answer that question by responding, by discussing briefly the Morant order from 2005, and look at the text of the statute, and then talk about what's going on with the order at issue here from May to August last year, and then talk about what went on during Winter Storm Fern in January. So taking those in order, the Morant order from 2005 is squarely on point with some of the issues we've been talking about, the need for immediate action now, but risk going on into the future. So in Morant, the Potomac River generating station was one of three power sources for Washington, D.C. The other two were two major transmission lines that connected D.C. to the grid. And the emergency arose when Virginia regulators ordered the power plant shutdown for violating air quality standards. Shutting down the plant would have elevated the risk of a blackout, but a blackout would only have happened if both other transmission lines failed at the same time. The Secretary invoked 202C, ordered the plant to remain open. In that circumstance, the only thing that was imminent was the shutdown of the power plant. There was no suggestion of an imminent risk of a blackout. There was no suggestion of a high probability of a blackout. And the Secretary acknowledged that in the order itself. He said, quote, I recognize that the simultaneous failure or outage of both transmission lines is not a high probability. And then he said, but there certainly is nothing in the statute that requires me to wait until a blackout actually has occurred and lives are put in jeopardy before invoking 202C. That's page 8 of the Morant order, and the source for that is in our brief at page 39, note 23. So Morant directly refutes this argument that there must be an imminent blackout, that there must be a high probability of a blackout. Instead, the imminent shutdown of the power plant, coupled with an elevated risk, is sufficient. And it's up to the Secretary, sole discretion of the Secretary, to decide how much risk is too much risk. But is that a situation in which even if there wasn't a high probability of a blackout in the very near future, there was still, you know, some not immaterial possibility of a blackout? And that is such a dramatic scenario that we've got to do something right now to make sure we stamp out that level of risk. It doesn't rise to the level of probable, but it's at the level of not something we can disregard, and it's too immediately pressing. So two responses to that. I don't think there's, you know, the Morant order didn't say anything like didn't have any quantification of a risk. It's just that it's not a high probability, but it's good enough. The statute delegates this discretion to the judgment of the Secretary. And here we have NERC, the standard setting entity, saying there's an elevated risk of a blackout in the region at this time. And so that's a record question, and the record, you know, all the petitioners' responses to that, they don't negate the fact that NERC says there's an elevated risk of a blackout. But they do put it in context. Their position is that NERC routinely designates areas as elevated risk without those areas ever experiencing blackouts. It's not useful for actually predicting whether there's an imminent electricity shortage. It's a much more nuanced signal. What's your response to that? It's pretty difficult for environmental petitioners to stand up here and say, we know best, to say, substitute their judgment for the judgment of the Secretary and NERC. Putting NERC's judgment in context and saying, we do understand what it means historically and how and whether any kinds of emergencies have either arisen or the Department of Injury has ever thought it was incumbent on it to respond to that. So, again, statute delegates discretion to the Secretary to decide how much risk is too much risk. And as far as the NERC report, it very clearly says that there's an elevated risk of a blackout at peak demand. And then it even says, it says that Section 202C orders may be necessary. That's in the recommendations in that report. It says... What may be necessary? 202C orders. That's JA-110. Then fast forward. For other evidence, just fast forward while we're talking about future orders to January of this year in Winter Storm Burn. So, at that time, MISO issued an emergency alert and ordered maximum generation. During that event, the Campbell plant generated enough power to power 600,000 homes for all 16 days of that severe cold weather event. And that was at a time when all other power sources had already been ordered at maximum generation. This affected real people with real lives who used power for everything from medical treatments like dialysis to giving their kids a place to sleep. And so, in very real world terms, these orders, in fact, offered power when it may not have been available. And for evidence of that, we point to the declaration of Tim Coker that we included as an addendum to our brief. That's page 17 of the addendum. He talks about the Campbell plant's generation at a period of 8 to 10 of that declaration. So, you know, I think that goes through. I guess the last point that I was going to say is the statute, Judge Pillard. The statute doesn't say the secretary may issue orders so long as they don't interfere whatsoever with long-term planning. In fact, it suggests quite the opposite because subsection B, and this is 824A. B says the secretary may issue orders upon application from a state or from any person. And so that suggests when long-term planners want to apply, you go to 202B. But 202C doesn't say that it requires an application. In fact, it says the opposite, with or without application, and with or without notice, hearing, or report. So it expressly contemplates or strongly contemplates that these orders will be used to, in fact, override the decisions of long-term planners. The regulations say the same things. The definition of emergency in the applicable regulation says extended periods of insufficient power supply as a result of inadequate planning can constitute an emergency. So that's at 10 CFR 205.371. That's his question. So I think this brings into play the backdrop of the executive orders that are at least the determinations about coal power that are kind of in the air here. The first line of your brief is the United States is facing a national energy emergency. And does that mean – and it's a 202C case, so I assume you mean emergency in a 202C sense. So does that mean that right now, throughout the nation, any plant that wants to reduce its operations or shut down 202C authority is in play? No, Your Honor, that's not what we meant by including that in our brief. I think that's not our position. In this case, we're talking about a single order. Why not? Why isn't that your position? Because why isn't a national energy emergency an emergency for 202C purposes? Because I think it would help me to understand the distinction. Thank you, Your Honor. It's evidence of this emergency. So in another case, in another region, another state, it surely could be evidence of an emergency in that context. But what I mean is, in this case, we're just talking about a single order, and we think it supports – it's evidence and supports the shortage in this case. And what is it? And, again, just to help me understand the categories you're drawing, what is it about this case that you would distill to say it's over and above the national energy emergency that currently exists everywhere? There are four – I'll give you, Your Honor, a combination of the four circumstances I mentioned before. Okay, those four. Got it. Correct. And NERC's – so a key piece of record support is NERC's Summer 2025 Reliability Assessment that says that the Midwest region was at an elevated risk of a blackout. And then that's, you know, for the three months of this order, that's a key piece of support. And then you add the testimony from MISO's vice president talking about some of the broader problems, the reliability problems with the grid, and the other evidence that we've submitted in the record. That's all what supports it. Okay. So what is the line that – I'm not sure that you have one, but the discretion of the secretary and the ability to foresee a potential shortfall? Is it limited to the prediction of a blackout? Or what's the limiting factor in your reading? I know you say we're only reviewing this, but, of course, we're always, you know, thinking about the precedent that we set. So offer us some limiting factors so that this isn't just carte blanche for a very interested energy secretary to skydive into anywhere in the country. Yes, Your Honor. I think a key limiting principle is that any order must be supported by substantial evidence commensurate with the scope of the order. So, for example, suppose I can imagine a winter storm, let's just say some wild winter storm that covered the entire country from Texas to Maine in three feet of snow and that had a severe, you know, cold front afterwards. That kind of record evidence would support some broader order perhaps. And so that's a key limiting principle is what is the record evidence that is commensurate with the scope of the order. Here we have just a very narrow order that's focused on one power plant in one region that is supported by concrete evidence about an elevated risk of a blackout in this circumstance. So I think that's a key limiting principle. And, you know, I know it's difficult because the statute is open-ended. Congress did that on purpose. Congress reviewed this in detail in response to the Morant emergency in 2015. The Morant order is all over the legislative history of those amendments. It's referred to 100 times in one of the hearings. And Congress responded. So the particular problem Congress responded to was in Morant, Virginia regulators had fined the plant for operating under the 202C order. So Congress responded, analyzed this, like, affirmatively looked at 202C and added the immunity provision in subsection C3 so that power plants are now immune from environmental regulations when they're operating under an order. Congress also added the 90-day limit and said each order needs to be for 90 days. You can renew it for unlimited periods, but then you need to consult with relevant agencies. So Congress thought about this. Congress thought hard and long about this and left the statute the way it is. Didn't add intensifier language. Didn't say only in these narrow circumstances. It left it open because Congress knows, can't foresee all the circumstances that might happen. And so that's kind of, it has to be the end of, I think, the sort of limiting principle we have. Anything further? That's it for limiting principles? It seems to me that there are four factors, you know, imminent shutdown of Campbell, difficulty to reverse that if the last minute one wishes one had the Campbell capacity online, data centers placing new and unprecedented demands on the grid, and then the elevated risk according to NERC. And it seems like if you take out the elevated risk according to NERC, that you don't have a basis for 202C. Do you disagree? Well, I think in this order. In this order. In this order, the NERC report is a key piece of evidence. It is. I mean, I agree with that, too, from your position. But you can't just say, you know, there's a lot of data centers coming in, some coal planters shutting down. You know, the long-term planning has done some addressing to replace the coal plant, and the data centers is putting demands everywhere. So I think that's right, Your Honor. If I might just, so all of Petitioner's responses to that summer reliability report failed. They have three main responses. Their first, and they reiterated it here today, was to say it's no big deal. Trust us. There won't be a heat wave. There won't be a wind drought. Nothing bad is going to happen. But that's not, that's for the Secretary to determine, not for environmental petitioners to stand up and say, we know better.  So I think. For states? It's for the Secretary under Section 202C to determine. So they say one response, no big deal. Second response. The second response is that both Michigan and MISO approved the shutdown of the Campbell plant back in April of 2022, or spring of 2022. Right? That's, of course, not relevant because we're talking about 2025 conditions. And it's been between, you know, that decision to shut down the plant was before all of this, before the surge in demand from data centers before the 2025 report. And their third, Michigan, but not the environmental petitioners, relies on a post hoc document, a July Department of Energy, July 2025 Department of Energy Resource Adequacy Report. That report was decided after the Campbell order was issued in May, and it doesn't at all support Michigan. It compellingly supports the Secretary and the Department. It uses two models. First of all, it's not in the record. It's Michigan's addendum. It uses two models that are relevant here. One is called the current system model. Michigan thinks it supports them. It doesn't because that model only uses data up to 2024. So the 2025 data isn't included. It's entirely irrelevant. Relatedly, that NERC 2025 summer reliability report talks about a surge in demand between 2024 and 2025. This is at JA107 and again at 109. What they say is between those two years, 2024 and 2025, the increase in demand year over year was more than double. So there's a surge in demand year over year. The 2024 data is completely irrelevant. The second model in that July 2025 report, again it's Michigan addendum, is called the status quo model or the plant closures model. That's the same thing. And it looks forward to 2030, and it says if all the plants that have announced closure, they all close down, and we have continued demand like we're experiencing, what will happen? And it shows system-wide grid failure by 2030. So going forward, it's catastrophic, and it's completely irrelevant to the 2025 conditions that we're talking about here. So those are the three responses to the NERC 2025 summer reliability report, and they all fail. If there are no further questions, I'll submit. Thank you. Thank you, Counselor. Mr. Schaaf. Thank you, Your Honor. Zach Schaaf for Intervenors, Consumers Energy Company, the Campbell Plant's majority owner. We're here for a limited purpose, so I'm going to try to be quick. We worked closely with regulators and stakeholders to protect our customers while complying with legal obligations. When we agreed to retire the plant in 2022, we vetted our plan with the Michigan Public Service Commission and MISO. Then when the Department of Energy judged that Campbell was necessary because MISO as a whole faced a shortage, we worked hard to bring the plant back from the brink of retirement. Our limited purpose here is really just to ensure that nothing in this case undermines our ability to recover the roughly $43 million in net costs we incurred under this order. We're seeking to recover those costs by the other track of Section 202C's two-track scheme, which vests emergency authority in DOE and then cost recovery issues in FERC. The reason why I think I can be quick here is that on the issues where we've taken a position, which are pretty narrow, the briefing has converged in a helpful way. First, everybody agrees that cost recovery is for FERC and belongs in appeals from FERC orders, not in this appeal from DOE's order. Second, on mootness, both DOE and the petitioners agree that the capable of repetition but evading review exception straightforwardly applies. These orders run 90 days. The FPA's mandatory rehearing period consumes 30 of those before a petition in this court can even be filed. And we already have the same basic dispute recurring in petitions that have sort of piled up before this court. I think the court can say that, make no new law. Maybe one piece to add, Judge Wilkins, in response to your colloquy with the government about sort of, you know, the longer term concerns in, you know, the subsequent orders versus the May 2025 order. If you look at page 42 of the hearing order in this case, it really squarely tees up the dispute about using Section 202C to address, you know, issues in the grid over the course of the next several years. So, you know, that's in this case, and it's in the subsequent cases that have come before this court. Our one request really is this. Whatever ground the court selects and whatever you say about mootness, we urge you not to suggest that the statement here would somehow entitle petitioners to refunds. We've briefed in Part 3 of our brief the stronger proposition. We don't think those are legally available, even if the order here is set aside. But we really think the proper approach for this court, given the Federal Power Act's division of authority, if you say anything about refunds at all, which we don't think is necessary, is just to say those disputes are preferred to address in the first instance. It sounds like you're about to finish. I am. It's basically a site check question, which is just to make sure I have the page right. Did you point it to 42 of the re-hearing order because of the juxtaposition between the current order, the order that's under review and subsequent orders? Yeah, paragraph 42 of the re-hearing order, which, you know, tees up these sort of medium-term resource advocacy cases. I just wanted to make sure we had it right. Thank you, Counsel. Mr. Shagnon, we'll give you the three minutes for rebuttal. Thank you, Your Honor. So, I have a few points I'll try to hit within that three minutes to just clear a few things up. So, the first thing I want to say overall is that you heard the government effectively adopting the approach to emergency that we discussed in our earlier portion. So, I just want to make that clear. The second is I'm not standing up here saying that my, as an environmental lawyer's preference for risk is what should govern. I'm saying this court should defer to what MISO and NERC and the states have said about this very problem. They've repeatedly distorted what that record actually shows. And if you look at a few pieces of that, you can see that there was no resource advocacy problem. So, if you look at JA69, that's where the MISO results say there demonstrated resource advocacy. If you look at the Ramey testimony he mentioned, both at 726 and 739, that MISO executive made clear that there's no resource advocacy problem in the near term or in the future. And resource advocacy is just the idea that there will be enough power to deliver to consumers. He makes a lot of references to the NERC assessment. He suggests our view is that we are denying that hot weather will occur and other things like that or there won't be storms. That's absolutely not true. NERC itself accounts for the existence of warm weather and storms. And if you look at three pages within the NERC assessment, they show pretty clearly that the blackouts that the government suggests are going to happen are not. So, on JA118, I mentioned this in my opening remarks, they make clear that the real risk here, the elevated risk here, is that reserves, which is, again, that surplus, might be lower. But the upshot of that isn't blackouts. It's that these mitigating measures that are well in place that DOE knows about because they're in MISO's tariff and NERC has required some of them will be used, not that blackouts will occur. He mentions this piece of the NERC report that says that 202C orders might need to be used. He omitted the fact in extreme weather conditions. And our position here isn't that anything needs to change about 202C and it still can be used in a short-term way. That's exactly what happened one month after this initial order where Duke, Carolina, asked for a 42-hour order to deal with a summer heat wave. And the last point is that if you look at JA, I believe it's 114, there's a suggestion that kind of embraces the surplus on top of surplus idea. They say the risk might be higher if they had stuck exactly to the reference margin, but they went above and beyond that. They got more. So the last point I'll try to make is about the Morant case, which I think my friend on the other side suggests dramatically supports his position. But there's two pieces of that that I'd like to clarify. One is that up top in the order on page two makes clear that they were facing an immediate reliability concern. And the reason that it was an imminent reliability concern in the sense that we've been talking about is when you're talking about transmission lines, there's only two. If either of those go down, the utility would have no other way of solving the problem other than running the Morant plant. In all sorts of other circumstances, there would be other solutions along the lines of these mitigation measures or running some other plant. Can you say either of those down? That's right. There's two, and there had been recent history where both had gone down, or there's the possibility when you have transmission lines that you want to take one down to do maintenance and other things like that. So it was a very pressing need there. And one other thing he overlooks is that on page nine of that order, the department makes exactly our point, which is, look, we don't want you to take this, D.C., as an invitation to not do better planning going forward. We expect you're going to really go all out on building a better transmission line because this is not our lane, and we don't want to be in it. And that's all the position we're adopting here in this case, and we think it appropriately is followed. And the very last point I'll say, if I may, is on the idea of my friend said his real concern here is that you can't bring the Campbell plant back. But he also says we're not trying here to engage in resource adequacy planning or generation planning ourselves, and those are fundamentally in tension. MISO and the states all looked at whether Campbell was needed to address problems going forward. They said no, and the reason they said no is because it's a harmful, unreliable plant. The department has a different view now, but it has nothing to do with whether it's needed. Can I ask one question about the NERC report and the point on 110, J110, about the forecasting the possibility that 202C authority may be needed?  So, I take your point that it says, specifically contemplates the exercise of 202C authority, and it says 202C may be needed to ensure that sufficient generation is available during extreme weather conditions. That's right. Are you reading that to mean, because you're emphasizing extreme weather conditions, are you saying that it's only contemplating the use of 202C when there's, in fact, extreme weather and we're going to react in real time to extreme weather? Or is it saying that 202C may be necessary to make sure that if there is extreme weather, there's going to be sufficient energy available then? Because the latter would indicate that it would at least leave open the possibility that you may need to use 202C now, because you never know when there's going to be extreme weather, as opposed to let's wait until there's the extreme weather event and then exercise 202C on the spur of the moment then. Or am I missing the distinction you're drawing? So, I'm reading it the first way, which is 202C still will be this last resort backstop. If we look at the weather report and see next week, it's going to be 105 degrees. And that's exactly how it was used, again, a month after this order in the Student Carolinas instance. Remember, it was used to say, fill me in on the, that you can run without environmental compliance. Can you explain that, why that matters, and why you couldn't bring Campbell back in a dirty mode and just at the last minute? That's right, and Duke Carolinas is not within the MISO footprint. But what it shows is that that was a case where Duke Carolinas saw a 1500 megawatt of generation was currently on outage, and it also confronted there's a heat wave next week. And the response was, which is often a typical response in these circumstances, we're going to allow you to temporarily exceed your permit requirements to allow your existing generation to squeeze out a little more juice. Recognize that may conflict with environmental regulations, but we'll allow it for 42 hours. And that's typically how 202C has been used. You know, my friend mentioned that this balance was struck in amending the statute in 2013, and that's an important reason why we should channel all of these exercises of planning outside of the 202C context, because one very important thing that you steer into when you use 202C pretty often is a conflict with environmental law, whereas other pathways will allow you to continue to comply with environmental law, use imports or things like that without creating this legal conflict. Make sure my colleagues don't have additional questions. Thank you, counsel. Thank you to all counsel. We'll take this case under submission. Thank you.
judges: Srinivasan; Pillard; Wilkins